# IN THE COURT OF APPEALS OF IOWA

No. 18-0415
Filed August 15, 2018

**IN THE INTEREST OF I.M.,**
**Minor Child,**

**C.M., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Marion County, Steven W. Guiter, District Associate Judge.

The mother appeals the termination of her parental rights to one of her children. **AFFIRMED.**

Charles E. Isaacson of Charles Isaacson Law, P.C., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

William E. Sales III of Sales Law Firm, P.C., Des Moines, attorney for minor child.

Terzo R. Steves of Steves Law Firm, PLLC, Des Moines, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Bower and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

The mother[1] appeals the termination of her parental rights to her child, I.M., who was born in 2007.[2]  The mother maintains there is not clear and convincing evidence to support the termination of her rights pursuant to Iowa Code section 232.116(1)(f) (2017) as I.M. could be returned to her care at the time of the termination hearing.  She also contends termination is not in I.M.'s best interests.

**I. Background Facts and Proceedings.**

I.M. and his older sister, A.M.,—who is not at issue in this appeal—were removed from the mother's care in January 2016 after the mother called 911 and reported bed bugs were in her skin.  The mother was transported to the hospital, where she tested positive for methamphetamine.  In the months leading up to the removal, the mother had other issues documented by the Iowa Department of Human Services (DHS), including two child-abuse assessments resulting from the mother's decision to leave the children home alone for a number of days while she went to a local casino to gamble.  The children were often unable to reach the mother while she was gone and did not know where she was or when she would return.  Additionally, around the same time, A.M.—who was then fourteen years old—moved a twenty-two-year-old man into the family home for a week without the mother noticing.

In the social worker's child-abuse assessment summary, he noted:

---

[1] The parent bringing this appeal is the biological maternal grandmother of I.M. who previously formally adopted him.  We refer to her as the mother throughout.

[2] According to the record, the biological father of I.M. is unknown.  It is unclear if any father had parental rights at the time of this action, as they may have been terminated at the time the biological mother's rights were terminated—before I.M. was adopted by the maternal grandmother.  No father's parental rights were terminated as part of this action.

This worker has been acquainted with [the mother] for the past 9 years. [She] loves her []children and has done the best that she has been able to do for many years with them. [She] has maintained a nice home. [She] has tried to give the children everything they need and she is very upset now that they have been removed. [She] for the past year has gone downhill physically. She is continuing to recover from a stroke so has made some gains but cannot drive at night, has diabetes, possible kidney issues and states she cannot walk down the stairs. [The mother] has had a host of bad circumstance[s] and now bad decisions that have greatly concerned this worker. Over the past few months [her] finances were a big concern. [The mother] began gambling and stayed away on at least two occasions for several days from the home, leaving the children home alone. [She] has now tested positive for methamphetamine.

In March 2016, I.M. was adjudicated a child in need of assistance (CINA). Later the same month, the mother submitted to a urine test, which showed a positive result for cocaine.

According to DHS's April 2016 report to the court, the mother has struggled with mental-health issues her entire life. She suffered a mental breakdown after separating from the father of her three biological children. She then turned to drugs as a coping mechanism. However, the mother maintains she lived a life of recovery for over twenty years before she used methamphetamine one time in January 2016. The mother was diagnosed with paranoid schizophrenia with chronic auditory hallucinations, an anxiety disorder, a mild alcohol use disorder, and a mild amphetamine type substance stimulant use disorder. Medical personnel noted a "strong suspicion" the mother was engaged in "very inconsistent medication compliance"—possibly due to her inability to keep track of when she last took her medication.

In June, the mother told the social worker that her positive drug test for cocaine was not due to her purposeful ingestion. Rather, she claimed she was

struggling with lack of money and chose to help her cousin, a known drug dealer, cut cocaine in exchange for cash. She maintained that she cut her finger and accidently got cocaine in the wound.

In July, the mother got into a physical altercation with one of her adult daughters. According to the police report from the incident, the adult daughter was lying in the hallway when the mother began to argue with her before ultimately pushing and trying to strike the daughter. The mother injured her hand during the incident and ultimately had to undergo surgery.

In September, the mother was discharged from drug treatment for failure to attend. The same month, DHS learned—from speaking with the mother's regular physician—that the mother's "health had declined as a result of lack of follow through and self-medicating." The physician indicated the mother "had gone blind in one eye and should no longer be driving at night." Additionally, the physician reported that the mother had never suffered from a stroke, explaining, "[The mother] came in seeking treatment and was in a catatonic state due to the illegal substances she had taken. [The mother] refused any blood testing and fell to the floor in a fetal position when asked to have her blood drawn."

At a doctor's appointment in October, the mother indicated she was still experiencing auditory hallucinations; she often heard music and voices mumbling to her. The voices were telling the mother to hurt people.

In January 2017, the mother's therapist reported the mother had been very inconsistent in attending appointments, with the mother attending only five appointments over the previous five months even though medical personnel recommended the mother attend weekly due to her diagnoses. The therapist was

concerned for the mother "as she had been having hallucinatory experiences which had increased as a result of stress resulting in increased . . . paranoia." The mother's most recent diagnoses were of schizoaffective disorder and depression. There was also concern about the mother's poor impulse control, which hampered her ability to handle stressful situations.

In May, DHS spoke to the mother's therapist regarding her mental health and possible dangers involved with allowing her less-supervised visits with I.M. The therapist opined the visits should remain fully supervised due to the mother's ongoing mental-health struggles, noting the mother's continued issues with social relationships, healthy dialogue, inability to see things clearly, distorted thoughts, and inability to think accurately or rationally. The therapist also opined it was not yet a good idea to have I.M. engage in therapy with the mother, as the mother's lack of appropriate reasoning capabilities made it unlikely I.M. could report something negative and have the mother respond appropriately to his concern or complaint.

The mother continued to exhibit paranoia regarding DHS and the family safety, risk, and permanency (FSRP) providers. She reported they were in "cahoots" to take I.M. from her. She also told one of her physicians that she continued to hear music playing in the home when she knew there was none, while also indicating she believed it was possible DHS had planted something in her home that was causing the noise.

In July, the State filed a petition to terminate the mother's parental rights to I.M. pursuant to Iowa Code section 232.116(1)(f).

The mother testified at the hearing, which took place in October 2017. When asked on direct examination, the mother testified that she is taking a new mental-health medication that prevented her from experiencing auditory hallucinations. She testified she is "stable right now." However, when asked by another attorney about a note in a report that the mother told a DHS worker one week earlier that she still experienced hallucinations when she was feeling sad, the mother agreed that was true. The mother's testimony indicated some confusion about dates. Additionally, the mother testified at length about receiving a $25,000 loan from a local bank, which she said had taken care of the money troubles she was experiencing when she decided to help her cousin cut cocaine. During her testimony, the following exchange took place:

> Q. What collateral did you put up for a loan? A. He's a good friend and my personal banker.
> Q. I understand that, but you just told us you have about $500 a month in income [from Social Security Disability] and you have no job. So what collateral did you put up for a loan? A. Once I got the loan—
> Q. That wasn't my question. A. Once I got the loan, I paid all my bills up, and I put extra money on that so they came back up to me having all my check, and each month they took out the money from the loan that I borrowed.
> Q. And how much was the loan? A. The loan was like 25,000.
> Q. Okay. So I'm going to go back to my question. What was the collateral you put up to get a loan for $25,000?
> A. I didn't have no collateral. It was a personal—it was my personal banker.
> Q. So you're saying Marion County Bank in Pella, Iowa, gave you a $25,000 loan despite the fact that you had no job? A. I have a letter to prove it.
> Q. Do you have the letter with you today? A. My attorney has the letter.
> Q. Have you paid the loan back? A. Yes. The loan has been paid off.
> Q. So in the course of the last year, you were able to come up and pay back a $25,000 loan? A. Yes, sir.

Q. With what?  A. My monthly check I get every month, it was deposited into the bank, and they would take their money out of my money when it come in.

Q. How much were they taking out a month?  A. 79, 84, something like that.

Q. How did you pay back a $25,000 loan in one year paying back $89 a month?  A. It was more than one year.

Q. So when did you go get the loan?  A. As soon as I found out that I couldn't get no other money nowhere else.

Q. You got the loan after this case opened, right?  A. Yes, sir.

Q. Okay. So let's for the sake of argument give you the benefit of the doubt that the case was opened in January of 2015, although it wasn't, okay?  So we have two years and nine months since this case has been open.  How did you pay it back in the 34 months you say it's been open paying $80 a month?  A. The checks that I get every month, a payment was taken out of each month until I paid it off.

Q. Ma'am, even if they took 100 percent of your check, you wouldn't have gotten it paid off during the time in which this case has been open.  A. Maybe I may be a little off or whatever, but I know my attorney has a letter.  The loan—I took the loan out, and it's paid off.

At a break in the proceedings, the mother's lawyer shared the letter the mother testified established that she had received a $25,000 loan and already paid the balance.  Later, the mother testified that she had misspoke and that she had actually received a loan for $2500 from the bank.  When asked more about it, the mother was adamant both that she received the loan in 2016 and that the June 2017 letter from the bank was about a loan.  Then the following exchange occurred:

Q. Okay. So you got your money in 2017?  A. No, it was 2016.

Q. So December of 2016?  A. No.

Q. November of 2016?  A. I can't recall.  The letter don't tell you.

Q. Ma'am, your letter doesn't mention anything about a loan.  A. But it tells you about my cable bill and heat being cut off and stuff, right?

Q. It says you were 500—$500 overdrawn in your checking account, and you were having bill problems.[3]  That letter is written

---

[3] The mother's attorney later stated he would upload the letter as an exhibit and no parties objected, but we have been unable to locate the letter from the bank in the record and note it does not appear on the docket.  However, as no attorney took issue with the State's

June of 2017 so were you in financial trouble in 2017? A. No, all my bills are paid up to date. It's 2017 now. All my bills is paid up to date in full.

Following the mother's testimony, A.M. testified that she wanted to be returned to her mother's care and that she believed the mother could keep her and I.M. safe. When asked why she believed that, A.M. testified, "Again, she's kept me safe this long. I don't see why [she] couldn't anymore." A.M. testified that when she lived with the mother, there was "not really" times when she felt the mother made decisions that put her at risk. However, she admitted when asked that there were times when she was left alone with I.M., had to get to a store in order to obtain food for them, and ultimately had to go to the police to get help. She also agreed that there were times that she "made choices because [she] knew [she] could have gotten away with it because [she] was at" the mother's home.

I.M.'s attorney, acting in a bifurcated role from the guardian ad litem (GAL), indicated:

> In meeting with [I.M.] earlier this week, I guess I'll say there was a hierarchy of what was most important to him. It was important to him to maintain an ongoing relationship with his [mother]. It was important to him to reach some sort of finality and though he didn't use the term "permanency," I think that was what he was essentially getting to that he feels that this is all gone on long enough. He just wants to know where he is going to be.
> In asking him directly and explaining to him that it would be my job to inform the Court of what he wanted, he said he would have liked to have gone home with [Mom] if she had done better, that he's happy with the [foster parents], that if he's adopted by them, he wanted to—wants to be able to keep his last name, but he reported that things are going well for him in that home.

---

attorney's characterization of the information contained in the letter, we presume the letter was as he described.

The juvenile court terminated the mother's parental rights to I.M. pursuant to section 232.116(1)(f).  The mother appeals.

**II. Standard of Review.**

We review termination proceedings de novo.  *In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017).

**III. Discussion.**

The mother maintains the State did not present clear and convincing evidence to support the termination of her parental rights.  She challenges only the fourth element of subsection (f)—that I.M. could not be returned to her care at the time of the termination hearing.  *See* Iowa Code § 232.116(1)(f)(4) ("There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102."); *see also In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting "at the present time" to mean at the time of the termination hearing).

While the mother maintains she made positive strides in dealing with her numerous mental-health issues during the pendency of the case, the evidence (other than the mother's testimony) does not support this assertion.  The mother has taken many of the steps asked of her by medical professionals throughout the case in working to be in a position where she could resume care of I.M. Unfortunately, in spite of her efforts, the mother's ongoing paranoia and hallucinations, as well as her inability to rationalize and make decisions during stressful situations, prevents the mother from being able to safely parent I.M.  We agree with the juvenile court that I.M. cannot be returned to the mother's care

because he would continue to be at risk of the same adjudicatory harms that existed at the time of removal.

Next, the mother maintains termination of her parental rights is not in I.M.'s best interests. In considering I.M.'s best interests, we give primary consideration "to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). According to the testimony of the social worker, I.M. has "integrated into his current home" and "excelled while being at the" foster parents' home. He told her that his basic needs were being met; contrasting the situation to living with his mother, he indicated he had been given a bedtime and never had to worry about getting his own meal. I.M.'s therapist reported that I.M. "is stable," "has less outbursts," and "is making positive peer relationships." She noted that he is no longer in an individual education program at school as a result of his growth. Moreover, after approximately eighteen months out of the mother's home, I.M. had expressed his desire for finalty. His desire for a permanent home coincides with our case law, which recognizes that "[a] child's safety and the need for a permanent home are now the primary concerns when determining a child's best interests." *In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially). While the mother is not currently in a position to fulfill those needs, his foster family is willing to accept him into their family permanently.

Finally, the mother alludes to the permissive factors in subsection (3), which allow the court to forestall termination of parental rights in certain situations. Iowa Code section 232.116(3)(b) provides that the court "need not terminate the

relationship between the parent and the child if" the "child is over ten years of age and objects to the termination."  Here, I.M. was appointed an attorney separate from his GAL because, in his attorney's own words, "there had been an indication that perhaps [I.M.'s] wishes were different than what was being recommended or was thought to be in his best interest."  However, based on his attorney's statement, it is not clear to us that I.M. did object to the termination.  That being said, even if he did object, we do not believe his desire to return to his mother's home overcomes the compelling reasons to terminate the mother's parental rights in this case.  *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (noting the factors in subsection (3) are permissive rather than mandatory and that it is up to the court to use its discretion "based on the unique circumstances of each case and the best interests of the child" in determining whether to apply the exception to termination).

We affirm the termination of the mother's parental rights to I.M.

**AFFIRMED.**